**UNITED STATES, Appellee,**

v.

**Edward W. SEELEY,
Defendant, Appellant.**

**No. 88–1431.**

United States Court of Appeals,
First Circuit.

Heard Nov. 8, 1989.

Decided Dec. 15, 1989.

Jamie Ann Sabino, with whom Klibaner and Sabino, Cambridge, Mass., Barry Haight, Milton, Mass., and Buckley, Haight, Muldoon, Jubinville & Gilligan, were on brief for defendant, appellant.

Ralph D. Gants, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES, Circuit Judge, VAN GRAAFEILAND,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

Edward Seeley appeals his federal convictions growing out of his participation in two bank robberies, one on April 1, 1983, in Lowell, Massachusetts, and the other two weeks later in Fall River. 18 U.S.C. §§ 2, 1951; 18 U.S.C. § 2113(d); 18 U.S.C. §§ 2, 2113(c). In mid–1987 the government tried and convicted three other participants in these robberies: James Bramble, Michael Fields, and Vincent MacPherson. We affirmed those convictions on appeal. *See United States v. Fields,* 871 F.2d 188 (1st Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989). The government did not try Seeley at that time because Seeley was then a fugitive from justice. However, in late October 1987 Seeley turned himself in; the government tried him in February 1988; and, he was convicted, in essence, of having masterminded the bank robbery scheme.

Seeley's argument on appeal consists of a claim that the trial court should have refused to admit as evidence the testimony of two witnesses who recounted out-of-court statements made by Robert Wayne, one of the bank robbers. Wayne was not available to testify himself, for he was found dead in May 1983, soon after the robbery. According to Wayne's girlfriend, Gail Brown, who testified at trial, Wayne said, for example, that he had worked for Seeley and Bramble stealing cars, that Seeley had provided his bail when he was arrested for trying to steal a beer truck, that he repaid Seeley with the proceeds of a robbery that Seeley had planned, that

---

* Of the Second Circuit, sitting by designation.

Seeley (in March 1983) had provided him with a disguise and a gun for a bank robbery, that Seeley had planned the Lowell robbery for April 1 (the next day), that Seeley was keeping some of the proceeds from the Lowell robbery, that Seeley and Bramble had planned the Fall River robbery, which Bramble and others had carried out, and that Seeley wanted Wayne to move out of Brown's apartment because Seeley was afraid that he was telling Brown too much. Gail Brown added various important details, such as that Wayne had showed her the gun and disguise, that Wayne showed her money that he said came from the Lowell bank robbery, and that Wayne described the plans for the Lowell robbery just before it took place. According to Robert T. Brown, Wayne's stepfather, Wayne told him that he had participated in the Lowell robbery, that he had participated in another robbery, and that Seeley was the "boss", the "brains," of the robbery gang.

■ The trial court admitted Wayne's out-of-court statements as statements against penal interest. Fed.R.Evid. 804(b)(3). All parties agree that the legal admissibility of the out-of-court statements depends upon whether or not the record contains sufficient indication of their trustworthiness. The Constitution forbids a court to admit into evidence the hearsay statement of an unavailable declarant unless it bears adequate "indicia of reliability." *See Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). The Supreme Court has added that a court can infer reliability "without more" where the evidence falls within a "firmly rooted hearsay exception," *id.; see Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987); and the exception for declarations against penal interest would seem to be "firmly rooted," *see United States v. Katsougrakis*, 715 F.2d 769, 776 (2d Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Nonetheless, the federal rule permitting introduction of this hearsay itself explicitly requires "corroborating circumstances clearly indicat[ing] trustworthiness" where a defendant uses such a statement to *exculpate, see* Fed.R.Evid. 804(b)(3); and courts have interpreted the rule as implicitly imposing a similar requirement where the government uses the hearsay to *inculpate. See, e.g., United States v. Riley*, 657 F.2d 1377, 1383 (8th Cir.1981); *United States v. Palumbo*, 639 F.2d 123, 131 (3d Cir.) (Adams, J., concurring), *cert. denied*, 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); *United States v. Oliver*, 626 F.2d 254, 260 (2d Cir.1980); *United States v. Alvarez*, 584 F.2d 694, 700–01 (5th Cir.1978) (holding that "the draftsmen of the new rules left to the courts the task of delineating prerequisites to the admissibility of inculpatory against-interest hearsay," and that admissibility requires "corroborating circumstances that 'clearly indicate the trustworthiness of the statement' ").

■ Seeley concedes that in *Fields* we found sufficient indicia of reliability to authorize the admission of Wayne's hearsay statements; and he must concede that, factually speaking, there are few, if any, significant differences between the record in that case and the record in this one. But, he argues that this case differs from *Fields* in one important respect. The defendants in *Fields*, says Seeley, asked this court to review only the circumstances that tended to corroborate the trustworthiness of Wayne, the out-of-court declarant. They did not ask this court to consider the probable veracity of Gail Brown and Robert T. Brown, the in-court witnesses. Yet, Seeley argues, the Fifth Circuit in *Alvarez* held that the trustworthiness of such out-of-court declarations

> is determined primarily by analysis of *two* elements: the probable veracity of the in-court witness, and the reliability of the out-of-court declarant.

*Alvarez*, 584 F.2d at 701 (citing *United States v. Bagley*, 537 F.2d 162, 167 (5th Cir.1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977)) (emphasis added). Seeley says that the record reveals the "probable veracity" of in-court witnesses Gail Brown and Robert T. Brown to be low or nonexistent.

We reject Seeley's argument for two independently sufficient reasons. First, insofar as the Fifth Circuit in *Alvarez* believes that the Confrontation Clause or Fed.R. Evid. 804(b)(3) requires some special proof that the *in-court* witness is credible, we disagree. The in-court witness testifies simply to the fact that the out-of-court witness spoke and to what he said; in respect to those facts, of which the in-court witness has personal knowledge, the parties are free to cross-examine just as they can in respect to any other fact about which an in-court witness testifies. The Supreme Court has said that the Confrontation Clause ideally envisions

"a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Ohio v. Roberts*, 448 U.S. 56, 63–64, 100 S.Ct. 2531, 2537–38, 65 L.Ed.2d 597 (quoting *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895)). In respect to Gail Brown's or Robert T. Brown's testimony about what Wayne said, this ideal was fully realized. Seeley was free to question either of them before the jury, to test their recollection, to "sift" their "conscience[s]," to expose their demeanor, to ask Gail Brown, for example, about her drug use, her grant of immunity, her motive for revenge. The Second Circuit, also disagreeing with *Alvarez* and *Bagley*, has held that neither the Confrontation Clause nor Rule 804(b)(3) requires the trial court to make a special assessment of the credibility of a witness who relates an out-of-court declaration against penal interest; rather, the credibility of an in-court witness is ordinarily a matter for the jury. *See Katsougrakis*, 715 F.2d at 777. We believe the Second Circuit is correct. *Cf. United States v. Satterfield*, 572 F.2d 687, 691–92 (9th Cir.) ("To exclude a[n *exculpatory* against-interest] hearsay statement because of doubt that it was made is to exclude it not because of its hearsay nature but for some other reason. Although some other rule of evidence (possibly Rule 403) may give the judge authority to exclude evidence on that other basis, Rule 804(b)(3), to the extent that it is a hearsay rule, does not."), *cert. denied*, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 804(b)(3)[03], at 804–147 (1988) (credibility of the in-court witness relating an *exculpatory* against-interest hearsay statement should be assessed by the jury rather than the judge).

■ Second, we believe that, in any event, the record contains adequate indication of "trustworthiness" of both in-court witnesses and out-of-court declarant. *See United States v. Barrett*, 539 F.2d 244, 253 (1st Cir.1976) (Fed.R.Evid. 804(b)(3) "invest[s] the district court with a substantial degree of discretion in making this important finding on trustworthiness"); *accord United States v. Poland*, 659 F.2d 884, 895 (9th Cir.), *cert. denied*, 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981); *cf. United States v. Briscoe*, 742 F.2d 842, 846–47 (5th Cir.1984) (applying a clearly erroneous standard to district court's determination of trustworthiness). As far as Wayne's trustworthiness is concerned, we rely upon our decision in *Fields*, 871 F.2d at 192–93, which Seeley does not now challenge. As far as Gail Brown's testimony is concerned, we find significant indications of trustworthiness in the detailed extent to which she reported Wayne's statements and the independent corroboration of much of that detail. She testified that Wayne told her, for example, that he had to abort a March 25 robbery attempt because a downed power line brought police to the area; that on April 1, he replaced a flat front tire on the stolen "robbery" car with a tire from Brown's car; that the April 1 robbery took longer than expected because a teller had trouble lifting a money bag over the counter; that the delay was sufficient for a police car to arrive and to chase them. Independent evidence showed each of these details to be true; and, taken together,

they tend, at least, to refute Seeley's claim that drug use clouded Gail Brown's memory. Moreover, the fact that Gail Brown sought out the police to tell them her story tends to refute Seeley's claim that she testified through hope of favorable treatment. Further, despite the importance of Gail Brown's testimony, the record contains some other corroborating evidence of Seeley's involvement in the events that Brown described:

a. Seeley was co-manager (and his wife part owner) of the Original Restaurant, where police officers found a marked $5 bill taken from the Fall River Bank.

b. Seeley and robbery participant MacPherson usually drove together each morning from the Boston Pre–Release Center to the Original Restaurant, where they worked. They normally left at 8:00 a.m.; but on the morning of the Fall River robbery they left at about 6:40, just in time for MacPherson to reach the Fall River bank when the first armored car delivery was made. The Center's logbook showed efforts to alter the "6" in the check-out time to make it appear an "8".

c. Another robbery participant, Michael Fields, called Seeley frequently after the April 1 robbery.

d. Seeley's credit card guaranteed Wayne's hotel bill for April 1, the night of the Lowell robbery.

e. Wayne, when arrested for trying to steal a beer truck, told his attorney to contact "Ed" [Seeley] to obtain bail money.

f. Seeley worked closely with the other robbery participants, Fields, Bramble, and MacPherson, at the Original Restaurant.

g. When Seeley heard the government was trying to apprehend him, he became a fugitive.

This other evidence offers some corroboration that Gail Brown was telling the truth, as does the fact that Robert T. Brown testified that Wayne also told him that Seeley was the "brains" behind the gang.

Of course, one cannot conclusively refute the possibility that Gail Brown cleverly made up a complex, detailed, partially verifiable implicating statement to revenge herself on Seeley whom she might have thought responsible for Wayne's death. But, Seeley was free to argue this matter to the jury; evaluation of this sort is what juries are for. *See, e.g., Barrett,* 539 F.2d at 254 ("the jury . . . is the principal judge of the credibility of witnesses and the weight to be given to otherwise competent testimony").

We note that Seeley also attacks the trustworthiness of Robert T. Brown. But nothing in the record suggests that Robert T. Brown was particularly unreliable. Seeley argues Robert T. Brown "related no specifics of the robberies" or of Seeley's "supposed involvement." However, Wayne may not have given him any such specifics. There is nothing to suggest that Robert T. Brown did other than repeat what Wayne told him.

In sum, we agree with the Second Circuit; we would not apply the Fifth Circuit's test in respect to the special reliability requirement for an in-court witness. But, even if we did so, we find sufficient indication of in-court witness trustworthiness to warrant admission of Gail Brown's and Robert T. Brown's testimony. We have already found sufficient reason to find Wayne's out-of-court statements trustworthy. *See Fields,* 871 F.2d at 192–93. Therefore, the judgment of the district court is

*Affirmed.*